# Eureka Co. *et al.* v. Norment *et al.*

*Statutory Action of Ejectment.*

1. *Adverse possession; what necessary to bar title of legal owner.*—In order to establish title founded on ten years adverse possession, so as to bar the title of the legal owner, the possession must have been hostile, actual, visible, notorious and continuous, under a claim or color of title; and no such right can spring from a mere claim or color of title unaccompanied by actual possession.

2. *Same; burden of proof.*—Where one asserts title by adverse possession, the burden is on him to show that the owner knew that he held adversely and claimed in his own right, or that his adverse holding was so open and notorious as to raise a presumption of notice.

APPEAL from the Circuit Court of Jefferson.
Tried before the Hon. JAMES J. BANKS.

This was a statutory action in the nature of ejectment for the recovery of land, instituted by James M. Norment and others against the Eureka Company and others. The cause was tried in the court below by and before the presiding judge, without a jury, on the pleas of not guilty and the statute of limitation of ten years, and resulted in a judgment for the plaintiffs.

The plaintiffs introduced in evidence a patent issued to James W. Norment, on a cash entry, dated June 1st, 1858, and plaintiffs were shown to be the children and sole heirs of said James W. Norment, who died intestate in May, 1881.

The defendants introduced evidence tending to show, that said Norment entered the land in December, 1854, but that the patent did not issue to him, till June 1, 1858, and that in 1855, the land was sold under execution against said James W. Norment, the ancestor of plaintiffs, and was bought at the sheriff's sale by Williamson Hawkins, Joab Bagley and James A. Mudd, through whom, by mesne conveyances, the defendants claim to own the land; the Eureka Company, one-half interest in it, and the other defendants, the other half. It was shown that Hawkins conveyed his interest in the lands purchased at said execution sale to Joab Bagley and to Wm. S. Mudd, as administrator of James A Mudd, James A. Mudd having died July 30, 1863, and W. S. Mudd having qualified as his administrator. The deed to the Eureka Company, was from the Red Mountain Iron & Coal Company, and bore date December 31st, 1873; that of the Red Mountain Iron & Coal Company was from Jno. T. Milner, dated January 31, 1863; that of Milner was from Joab Bagley, dated June 6, 1862. The deed to Wm. S. Mudd, under whom his devisees and executors claim, was made under a decree of the probate court of Jefferson county by James A. Ware, and conveyed all the interest of James A. Mudd in the lands purchased by him at the execution sale, and bore date May 12th, 1873. The defendants did not produce the sheriff's deed to the purchasers at said sale, nor was there any evidence tending to show that any such conveyance was ever made by the sheriff, or that the legal title was ever, in any manner, divested out of said Norment, except as it was claimed to have been divested by adverse possession for ten years, on which defense the defend-

ants relied. To establish this defense, the defendants introduced one Simonds, who testified that in 1855 or 1856 he built a cabin on the land; that his house was built on this land by mistake, that he thought the land in controversy was public land, and when the lines were run, in 1859, by a surveyor, he ascertained that his house was built over the line, on this land, by about 20 steps; that he took possession of it as public land, believing it to be such, and enclosed about three acres of it; that when the line was run out, Joab Bagley told him he could stay there as long as he desired; that he did not care for his living on it, as it was a mistake by which he had entered on it; that he left the land on the 1st of January, 1869, never spoke to Mr. Bagley about it after he told him in 1859, he could remain on it, nor to any one else, and never paid any rent or heard anything more about it; that there was no other house but his on the land, and no one lived on it during the time he lived there, and he knew it as the Norment tract; that Bagley told him to stay as long as he desired and to watch over the land, and he stayed as his tenant.

The next possession of said land, was in 1873, when one Autonne is shown to have lived for 12 or 18 months in the cabin built by Simonds, and cultivated some 5 or 6 acres in a garden for Mr. DeBardeleben. His statement was, that ''he went there to garden for Mr. DeBardeleben,'' who was shown to have then been the superintendent and general manager of the Eureka Company. Autonne left the place in the summer of 1874. After Autonne left, one George Smith moved into and occupied the Simonds house in 1876, and remained there for about a year, and left the latter part of 1876, or the first of 1877. His statement as to occupancy was, that he got the land from Mr. Noble or Mr. Mount, one of whom was shown to have been the cashier, and the other, the book-keeper of the Eureka Company. What he did while he lived on the land, and for what purpose he lived in the house, is not shown. No other occupancy or possession is shown after his removal, until in 1879 or 1880, when a man by the name of Griffin, in order to enter some lands adjoining it, moved into the cabin and remained there for two or three months. His statement to a witness was, ''that the Eureka Co. told him to live

there, until he got his house ready.'' He cultivated about an acre and a half, and when his own house was ready, he moved off of this land into his own house, near by. For two years—from June, 1882, to June, 1884—it was shown that one Brewer leased the lands in controversy from Wm. S. Mudd, and erected a saw mill and some temporary houses on them, which he afterwards removed to Birmingham. In March, 1885, one Hale, a negro, rented the lands from the Eureka Company, and cultivated a part of them for that year—the patch around the Simonds house. This was the last occupancy shown, before the bringing of this suit, in May, 1890, except that the Eureka Company had in the meantime been cutting some timber off the land.

One Alva Buchanan, a negro, testified that he had known the lands for 12 or 13 years, and that the hands of the Eureka Company used pine off the lands, off and on, ever since he had been there; that he saw the Eureka Co. some three or four times in the same year, some 12 or 13 years before suit, haul timbers from the lower end of the land next to the mines, and that for the last 15 years, until the last six years, he knew nothing about the land at all. The proof also tended to show that the lands were known and called the Norment entry, and sometimes, as the Mudd and Miles lands. One of defendants' witnesses, Wade, who had and owned a saw mill, some five or six miles away, testified that he tried unsuccessfully for six months in 1879, to ascertain who owned the lands, and was eventually informed by one Dr. Vaun.

It was shown that for some of the years, from 1871 to the trial, the lands had been assessed and the taxes paid, sometimes by Mudd and again by the Eureka Co. In 1878, they were assessed to a man by the name of Alberto Martin, and for several years no showing was made as to their assessment and the payment of the taxes. The assessment books were lost. The proof also tended to show, that only a few acres of the land—from 2 to 6 acres—had ever been cleared, and the tract was mainly valuable for timber, but was adapted to farming, comparing favorably with the agricultural lands of that section of country, and was good for grazing cattle.

The plaintiffs offered in evidence and read, against the objection of defendants, the record of a suit in chancery filed by defendants against the plaintiffs for the purpose

of enjoining the prosecution of this suit, and showing that an injunction was obtained enjoining the further prosecution of the same, on the grounds, as alleged in the bill, that the purchasers of the lands at the sheriff's sale, in 1855, had paid the amount of their bid, but had never received a deed from the sheriff, and seeking to have the present sheriff execute one, so as to convey the legal title to them. The bill alleged that at the time of the sale the lands were and still are woodland, the soil poor and almost entirely unsusceptible of cultivation, were valuable only for firewood, which might be cut from them, and that complainants and their successors made such use of said lands for several years after their purchase of them at sheriff's sale; that when the lands passed into the hands of the Red Mountain I. & C. Company, they were used for the purpose of obtaining wood to make charcoal of for said company; that since then a saw mill was operated on said lands for several years. It was further alleged, that unless the court enjoined said suit, the plaintiffs therein would be successful. The bill was sworn to by the attorney for complainants, an injunction was granted, upon the execution by defendants of the injunction bond. The bill was demurred to by the defendants—the appellees here—and a motion submitted to dissolve the injunction. The demurrer and motion were overruled. The defendants appealed to this court, which reversed and remanded the cause, and afterwards the demurrer was sustained, and the bill dismissed. The Eureka Co. paid the costs of that suit. The defendants objected, generally, to the introduction of this record, on the ground, that it was "immaterial, irrelevant and incompetent," and excepted to the overruling of the objection.

There was no evidence that said Norment or his heirs ever knew or had information of any claim of the lands adversely to them, or of any of the possession of the same by any of said parties, or that they were ever held adversely to them. The only evidence tending to show anything on that subject was the bare fact of the sale of said lands under execution in 1855.

The court gave judgment for plaintiffs, and to reverse the judgment, this appeal is prosecuted. The errors assigned are the admission of the record in evidence, and the rendering of said judgment.

HEWITT, WALKER & PORTER, for appellants.—The undisputed evidence, shows that Simonds did not enter by permission of or in privity to Norment—the least favorable view of his entry to the defendant being that it was that of a mere trespasser—in which case no change of possession or notice of attornment, in disavowal of title, was necessry to constitute the holding adverse. In case of a trespasser, who attorned to a party, claiming the land, and remained in possession after the attornment under him, the mere putting a tenant in possession, who erects a house thereon, and continues to occupy it for a series of years is, unexplained, a possession under claim of right. *Bernstein v. Humes*, 71 Ala. 260.

When once an adverse possession has been established, it can be broken only in one of three ways : (1) By the act of the real owner ; (2) by the intrusion of a stranger ; (3) by the abandonment of the premises by the occupant himself.—*Hughes v. Anderson*, 79 Ala. 215.

Having shown adverse possession in Bagley, by the occupancy of the house erected on the lands by Simonds, it was necessary that an abandonment of the possession be shown to terminate the adverse possession. What then constitutes such an abandonment? Only a departure from the premises with no intention to return thereto. Mere absence is not sufficient. The departure of a tenant could not, of itself, indicate any intention on the part of the landlord to abandon the premises. In order to destroy the continuity of possession, the vacancy must not be merely occasional, such as occurs in every case where a party from some cause is unable to obtain a tenant and shuts his property up for a short or indeed a long time.—*Sailor v. Hertzog*, 4 Wharton (Pa.) 271. The continued presence of the house on the lands not only indicated that there was no abandonment of the premises by Bagley, but was notice to the public thereof. So long as it remained and was kept up in a habitable condition, the question of abandonment *vel non* was not a question of secret intention on the part of Bagley, but was determinable by one who viewed the premises themselves. Where the premises are at times vacant, but no intention to abandon possession exists, the possession will not be interrupted.—1 Amer. & Eng. Encyc. of Law, 274, note citing cases. *Judson v. Malloy*, 40 Cal. 309 ; *Stettische v. Lamb*, 26 N. W. Rep. 377; *DeLavega v.*

[Eureka Co. *et al.* v. Norment *et al.*]

Butler, 47 Texas 529; *Rayner v. Lee*, 20 Mich. 384; *Haywood v. Thomas*, 22 N.Y. Rep. 460.

ARNOLD & EVANS, *contra*.—No brief came into the hands of the Reporter.

HARALSON, J.—1. That the legal title to the lands in dispute had been in the plaintiffs in this action is not denied. The plaintiffs made out a *prima facie* case, and the defense depends upon establishing the plea of the statute of limitations of ten years, interposed by defendants.

The law as applicable to the facts of the case, and by which it is easily determinable, is so well settled as to need no further discussion. For the purposes in hand, we need to do no more than to restate some of our oft repeated holdings on the subject. Recently we stated, as a summation of the authorities, that a claim of title founded on ten years adverse possession, to have the effect to bar the title of the legal owner, must have been hostile or adverse, actual, visible, notorious and continuous, under a claim or color of title; that no right can spring from mere claim or color of title, unaccompanied by actual possession, and that, in the absence of such an adverse possession as falls within this definition, there is no room for the assertion of title by adverse possession, and the question of superior right of possession between the parties, becomes, at law, one of superior legal title.—*Parks v. Barnett*, ante, p. 438; *Bernstein v. Humes*, 71 Ala. 260; *Dothard v. Denson*, 75 Ala. 482; *Hughes v. Anderson*, 79 Ala. 209; *Alexander v. Savage*, 90 Ala. 385; *Murray v. Hoyle*, 97 Ala. 588.

It must be shown—and the burden is on him who asserts a claim adverse and hostile to the legal title—that the owner knew that the adverse holder claimed in his own right, or it must be so open and notorious as to raise the presumption of notice.—*Ponder v. Cheeves*, ante, p. 307; *Normant v. Eureka Co.*, 98 Ala. 181; *Lucy v. Tenn. & C.R. R. Co.*, 92 Ala. 250; *Beard v. Ryan*, 78 Ala. 44; *Bell v. Denson*, 56 Ala. 448; *Farley v. Smith*, 39 Ala. 44; *Lucas v. Daniels*, 34 Ala. 188.

We have carefully reviewed the facts of this case. From these it does not appear, that either one of the purchasers of said land at sheriff's sale, ever went on

them, or exercised any act of ownership over them, before the year 1859. The tract was unoccupied woodland. The first act of occupancy, shown by the defendants, was that of the man Simonds, in the year 1855 or 1856. He squatted on a few acres on the corner of it, and built him a small cabin, believing it to be Government land, and did not know any better, until between the last of January or the first of March, he was informed by Joab Bagley, that his cabin was not on the public land, but was over the line about 20 steps. To this time, he had set up no claim or right whatever to the land. Bagley told him he might remain there, as long as he pleased, and Simonds said he held it as Bagley's tenant. He abandoned the land on the 1st of January, 1869. If it be conceded, that this possession was Bagley's and was open, hostile, visible and notorious, yet, by Simonds' own evidence, it fell short of ten years, for the earliest period he fixes for his tenancy under Bagley is the last of January, 1859, and he left the 1st of January, 1869; but, if it had covered the whole of 1859, it could not have ripened into a title, because the time elapsing between the 11 January, 1861, and the 21 September, 1865, by ordinance of the State convention of 1865, could not be estimated. From the day Simonds left until 1873, when Autonne took possession—a period of at least ten years—there was no possession or acts of ownership shown by any one. In 1873, Autonne is shown to have taken possession of the cabin built by Simonds, and cultivated some 5 or 6 acres for Mr. DeBardeleben, who was shown to have been the superintendent and the general manager of the Eureka Company. This company did not derive title to its part of the land, until December 31, 1873. Autonne remained 12 or 18 months and left in the summer of 1874. According to this evidence, he could not have moved there in the early part of the summer of.1873, in the interest of the Eureka Company, which had no title—though DeBardeleben may have been its superintendent—before December 31, 1873. From the summer of 1874, when Autonne left, until 1876—a period of about 18 months—no one was in possession and nothing appears to indicate an open or notorious act of ownership. It was abandoned, so far as such appearances went. In 1876, one George Smith moved into the cabin, and remained there until the latter

[Eureka Co. *et al.* v. Norment *et al.*]

part of that year, or the first of the next. For what purpose he went, and what he did while there, is not shown. It was said he moved in by the consent of the cashier or book-keeper of the Eureka Company. No occupancy followed him until 1879 or 1880, when Griffin moved in, as was said, by the consent of the Eureka Company, and remained three months. After this, it remained unoccupied for over two years, when, from June, 1882 to July, 1884, it was leased to one Brewer by W. S. Mudd. From June, 1884 to March, 1885, it was unoccupied, when a negro by the name of Hale rented it from the Eureka Company, and cultivated the patch around the Simonds house during the year. This was the last occupancy shown, until May, 1890.

We have traced these several acts of possession and occupancy upon which defendants rely to base their title by adverse possession, to show that they were fitful, uncertain and not continuous. There was not a fact in evidence tending to show that these different possessions could be tacked as continuous; but they were separate, independent, and remote, the one from the other.

One of the defendants' witnesses, Wade, who had a saw mill not a great way off, testified that in 1879, he endeavored for about six months, by making inquiries, to ascertain who owned these lands, and was unable in that time to ascertain who was the owner. Certainly, the possession and claim of defendants could not have been very open and notorious, such as would imply a knowledge of it on the part of the plaintiffs or others, if such were the case. And again, one coming to investigate the reality and foundation of this alleged hostile, adverse possession, can not well understand why, if it existed, the defendants might not have established it by satisfactory proof. Where are DeBardeleben, Noble, Mount and other officers of the Eureka Company? Not one of them have been examined.

The conclusion is, they knew nothing, and of all men, it seems, they would have known the most. The evidence offered falls far short of establishing any continuous adverse holding by the defendants for ten years, at any time since their purchase of said lands in 1855.

Of the introduction of the record of the chancery suit between these parties, to establish the sheriff's deed and divest the title out of plaintiffs, we may say no more

than that, if it was inadmissible, it was error without injury, since the other evidence in the cause is sufficient to support the finding and judgment of the court below.

Affirmed.